Hallenback v. Rogers.

FRANCES HALLENBACK

v.

ARABELLA ROGERS and JOHN M. ROGERS.

[Submitted May 9th, 1898.   Filed June 1st, 1899.]

1. A partnership *inter sese* may be established by proof of an express contract, or of such acts and representations of the partners towards each other regarding the subject-matter of the partnership as necessarily lead to the conclusion that they have entered into that relation.

2. Where there is no express agreement for a partnership, no holding of partnership property in either title or use, no division of profits nor agreement therefor, and no agency of the supposed partners for each other, in carrying on the supposed partnership business, there can be no partnership *inter sese*.

3. Where one party pays the purchase-money and the legal title is conveyed to another, the usual presumption is that the grantee holds in trust for the party paying the purchase-money, but this may be rebutted by proof that the latter intended the grantee to take beneficially.

4. Where the parties are parent and child, the presumption is that the payment of the purchase-money was a gift, and this presumption must be overcome by proof in order to establish a resulting trust.

On bill, answer and proofs.

The complainant in this case is Mrs. Frances Hallenback, a widow lady, the mother of the defendant Mrs. Arabella Rogers, who is her only child. The defendants are the daughter, Mrs. Rogers, and her husband, John M. Rogers.

The complainant alleges that in 1873 she bought from John C. Bullitt the lot of ground at Cape May upon which the boarding-house known as the "Marine Villa" was subsequently built; that she paid to Mr. Bullitt, through the defendant John M. Rogers, $1,000 on account of the purchase-money, and that as Rogers "was to assist in erecting the hotel and pay part of the purchase-money for the ground," the deed for the lot was, at his request, made by Bullitt to the complainant's daughter, then Arabella Hallenback. There were several subsequent purchases of adjoining lands, the titles to which were also taken in the name of the daughter. The complainant alleges that she largely furnished the house when it was built; that she took possession of it and managed and ran it for the benefit of herself and the defendant John M. Rogers, who shortly after the purchase had married her daughter. The daughter assisted, during the earlier period, in the management of the house, but of late the complainant has done it all. The complainant further alleges that she purchased a large part of the furniture of the hotel with her own money, or with the receipts from the business, though she admits that the rest of the furniture and large additions to the hotel itself have been paid for by the daughter and her husband. The daughter, her husband and children lived during the season with the complainant at the hotel, but at no time was any board asked or received from them. The hotel was advertised as "'Marine Villa,' Mrs. F. Hallenback, proprietor." For a number of years these publications were printed by the defendant Rogers. She claims that in the twenty years in which she has run the hotel she has made it a valuable property, "and has acquired a large interest therein by her labor and expenditures, and has brought her experience to the business and created a good will now attendant upon the premises." She further alleges that in 1895 she purchased an adjoining property known as the "Albert Cottage," paying $2,500 in cash, and "assenting that the title should be in the said Arabella Rogers," the latter giving a purchase-money mortgage for $17,500, and she states that all payments made on account of the "Albert Cottage" have been made in part out of the proceeds of the business of

the "Marine Villa," and partly from pension money received by the complainant. She claims to have paid from her own money, and from that arising from the business, for repairs, insurances and taxes on the "Marine Villa," and also on the "Albert Cottage," and somewhat on account of the mortgage on the latter cottage. She states that in the year 1897 the defendants refused to allow her to have access to the "Marine Villa," or to have her personal belongings, books and papers, unless she would execute a lease and pay a fixed sum as rent, and that they threatened to exclude her from that property, and to let the "Albert Cottage," of which she remains in possession, and she prays an answer without oath, and that "the partnership existing between the complainant and the defendants may be dissolved, and an account taken under the order of this court of all the partnership dealings," and that what appears to be due complainant may be decreed to be paid her by defendants, and for a receiver for the partnership assets, including the "Marine Villa" and "Albert Cottage;" and that defendants may be restrained from selling or encumbering these properties or any of the other properties of the partnership, and that all the property of the partnership may be sold.

The defendants answer the bill jointly and severally. They deny that the complainant purchased the lot of ground on which the "Marine Villa" was subsequently erected, and that she paid a part of the purchase-money to Rogers on account of that purchase as stated in the bill. They admit that the deed was made for that lot by Bullitt to the daughter, but they aver that this conveyance was made pursuant to a purchase of the property by the defendant Rogers, with his own funds, for the daughter whom he soon afterwards married, and they allege that he (Rogers) subsequently erected thereon the hotel or boarding-house called the "Marine Villa," which he completely equipped and furnished at his own expense, for his wife. The defendants state that the complainant and the defendants jointly occupied the property, as one family, for a number of years, during which the complainant took an active part in the business management, without any express understanding or agreement between the

Hallenback *v.* Rogers.

parties other than that the complainant should help in the business as one of the family. They further answer that, in 1893, the complainant agreed with the defendant Arabella Rogers to take a lease of the premises for the complainant's exclusive use and benefit, at a rental of $3,000 a year, and that the complainant occupied the premises on those terms, and paid the first and second year of her occupation, under the lease; that having failed to pay the third year's rent, the defendant Arabella Rogers, in the spring of 1897, took possession and commenced business on her own account. The defendants deny that the complainant purchased the "Albert Cottage," and that she paid $2,500 on account of the purchase-money, and they say that the defendant Arabella Rogers purchased that property, with the assistance of her husband, and took the title in her own name, and that the complainant, up to the time she took possession of the "Albert Cottage," never advanced or paid any of her own funds towards the purchase, improvement, repair or furnishing or expenses of any of the premises. They admit the complainant is in possession of the "Albert Cottage," but they say she took possession of it without the defendants' consent and without any legal right so to do, and they have refused her access to the "Marine Villa," for fear that she would install herself therein and take possession, which she has sought to do, under the false pretext that some of her personal effects were left there, which she desired to remove.

The defendants expressly deny that the complainant has any right, title or interest, either in law or equity, in or to either of the said properties, and that she was ever a partner with them or either of them; and they deny all right on her part to an accounting in respect either to the property or the business heretofore conducted thereon. And the defendants further insist that the matters complained of are determinable at law, and pray the same benefit as if they had demurred to the complainant's bill.

*Mr. Thomas E. French* and *Mr. Lindley M. Garrison,* for the complainant.

*Mr. David J. Pancoast,* with whom was *Mr. William S. Hilles,* of the Delaware bar, for the defendants.

GREY, V. C.

It is to be noted that the bill of complaint, though all the prayers seek relief by dissolution account and receivership which presupposes a partnership, nowhere alleges that any agreement of partnership was ever entered into by the parties, nor does it contain any averment that the narrated facts brought the parties into the relation of partners.

Nor is there anywhere in the bill any statement defining what constituted the supposed partnership property. The lots whereon the "Marine Villa" and "Albert Cottage" properties are situate are described, and the prayer of the bill refers to them in asking that a receiver may take possession of the partnership property, "including said 'Marine Villa' and 'Albert Cottage,'" but the bill nowhere specifically alleges that these pieces of real estate or their equipment and furnishings, part of which it is alleged were supplied by complainant, are, in fact, partnership property. The whole ground of relief sought by the complainant is based upon this supposed existence of a partnership between the complainant and the defendants, and on the ownership of partnership property not specifically defined, but which it is assumed included the "Marine Villa" and the "Albert Cottage," the two boarding-houses at Cape May.

The defendants deny that there is or ever was any partnership, and all the testimony taken has been directed to the establishment or refutation of the existence of that relation between the parties. The arguments presented and cases cited by both sides have sought to maintain or refute the claims of the complainant that there is a partnership which she prays may be dissolved and that its assets consist, in part at least, of the "Marine Villa" and the "Albert Cottage," the titles to which stand in the name of the defendant Arabella Rogers. Whatever claims the complainant makes that there are other partnership assets than those two properties, are set forth with so little certainty of statement in the bill that it is difficult to know of

what they consist. So far as the furniture of the "Marine Villa" is concerned, the testimony of Mrs. Hallenback herself, hereinafter adverted to, clearly shows that the portion placed in the "Marine Villa" by her is by her declared to be in her own individual ownership. The boarding-house business there carried on, she says was her own. The "Albert Cottage" was bought already furnished, in the name of Mrs. Rogers, under the circumstances hereinafter narrated. The case presented as to the property sought to be affected is, in substance, an effort to have the title to these two tracts of land, the "Marine Villa" and the "Albert Cottage," declared to be partnership property and to have an accounting with respect thereto, and a receiver, &c.

In the happening of the events narrated in the testimony, those attending upon the purchase of the lots on which the "Marine Villa" and its extensions were erected, and the conduct of the business in that house up to 1894, will be first examined, for, in my view, the relations of the parties touching the "Marine Villa" were changed in 1894.

The "Albert Cottage" and its furnishings were not purchased until 1895, and the matters relating to these involve a different series of facts and will be separately considered.

The original purchase was the first lot on which the "Marine Villa" now stands, and was made from Mr. Bullitt. At that time the complainant was keeping a boarding-house in Cape May. Her business, in which she had been engaged there for two years, had been profitable, but it is quite evident that she was then a person of extremely limited means, as it is uncontradicted that she was financially embarrassed two years before, while in Philadelphia, where there were several judgments unpaid, outstanding against her; and her property in Philadelphia has been sold away from her except a portion which was surreptitiously brought to Cape May. She appears to have opened with Mr. Bullitt the negotiations for the purchase, but no progress had been made to conclude them before Mr. Rogers the defendant, who had been boarding with her for several years before, and was at that time engaged to be married to her daughter, was brought into the dealings. Mrs. Hallenback her-

self states that she thought she had not sufficient money to go on with the purchase of the lots. The property was conveyed by Mr. Bullitt to Miss Hallenback, all parties agree, by the assent of the complainant and of Mr. Rogers and in the expectation of his marriage to that young lady. Mrs. Hallenback, in one part of her testimony, states that she paid through Mr. Rogers, on account of this purchase-money, about $500, and in another part that she paid about $1,000. This money she states she had saved and put away in a trunk, but she was unable to define with precision in what sums or at what time in the negotiations she gave it to Mr. Rogers.

On the other hand, Mr. Rogers swears that none of Mrs. Hallenback's money was used in this first payment. He states Mrs. Hallenback did deposit with him some five or six hundred dollars in checks to be cashed, yet she afterwards drew out all the money to pay her outstanding bills and her daughter's wedding outfit, and this Mrs. Hallenback does not contradict. He further testifies that he had at one time some $13,000 in cash in bank, and that he paid out of his own money the whole first payment of $1,000 by a check which he produces for that sum, drawn to the order of Miss Hallenback, whom he was about to marry. He says he made this payment for his intended wife because he wished the property to stand in her name.

Mrs. Rogers corroborates this testimony of Mr. Rogers that he paid this first $1,000. She identifies the check and states that the title to the property was taken in her name because Mr. Rogers was to give her the property.

This is the only payment of the purchase-money of any of the land which Mrs. Hallenback in any way identifies (save as to the "Albert Cottage" hereinafter discussed) and which she claims to have made, and on this, while the burden of the proof is upon her to prove her allegations in the bill that she "paid of her own money, on account of said purchase, to John M. Rogers for John C. Bullitt, about $1,000," the weight of the evidence is against her.

All the deeds were, with Mrs. Hallenback's knowledge and agreement, made to her daughter. All of the mortgages were made and paid by the latter and her husband.

After the first purchase from Bullitt additional adjoining lots were bought from Mr. Hulme and Mr. Stevens. Mrs. Hallenback does not claim to have contributed anything to pay for these additional purchases. These titles were all taken in the name of Mrs. Rogers, with Mrs. Hallenback's consent, and the purchase-money was paid fully by Mrs. Rogers' husband. The "Marine Villa" building, not at first known by that name, was erected in the year 1873 and the early part of 1874 on the lot first·bought. Mr. Rogers had married Miss Hallenback in October, 1873. The construction of the building was planned upon consultation of the whole family, and the construction of it was superintended by the different members of the family, Mrs. Hallenback being on the ground during the principal part of the oversight. The contracts for construction were made with Mrs. Rogers; the payments for the building were made by Mr. Rogers. Differences arose with the contractor as to the performance of the building contract, which was adjusted with the aid of Mrs. Hallenback's consultation with Mr. Bullitt, but the payments continued to be made by Mr. Rogers. Additions were made to the building, which were paid for by Mr. Rogers. They consisted of a porch along the side and an extension of the kitchen, and finally, in 1891, of the erection of a fourth story and general reconstruction of the house, doubling its room capacity. All of this expense was admittedly borne by Mr. Rogers, save that Mrs. Hallenback claims to have aided in paying for the new kitchen.

During the whole period from 1874 up to 1894, Mr. and Mrs. Rogers and their children, and, at times, Mr. Rogers' mother—in short, the whole family—lived in this property during the season in entire harmony. Mrs. Hallenback and Mrs. Rogers were mother and daughter to each other.

Mrs. Hallenback, during these twenty years from 1874 to 1894, conducted the boarding-house business in the "Marine Villa" in its original and its enlarged condition. She alone was recognized as the proprietor of it, not only by the public but also by Mr. Rogers and his wife. It was in fact as well as ·in name Mrs. Hallenback's boarding-house. Nowhere in the

Hallenback *v.* Rogers.

evidence is there any suggestion that Mr. Rogers at any time assumed any right in the management or conduct of the boarding-house business, nor that his wife, the defendant Mrs. Rogers, assumed to have any control or authority over the business save that she once referred to it as carried on with her mother on "joint account." Mrs. Hallenback testifies that Mr. and Mrs. Rogers had no management whatever in the boarding-house business—that was left solely to Mrs. Hallenback. Mrs. Rogers, she says, assisted her when it was necessary. Nor, on the other hand, during the whole twenty years between 1874 and 1894 does Mrs. Hallenback appear to have assumed any authority to make any contract touching the disposal of the " Marine Villa" by way of mortgaging, renting or other disposition. All such business was done exclusively by Mr. Rogers and Mrs. Rogers. They incurred all the mortgage debts on the property, and paid them, both principal and interest. Mrs. Hallenback's acquaintance with the mortgages was so trifling that she declared that she was unable to state with certainty the amount which had been thus placed on the property. When the leases were made, during the years 1883, 1885 and 1886, they were made by Mrs. Rogers, apparently without any interference or direction from Mrs. Hallenback, and all the rent was collected by Mrs. Rogers, who, as Mrs. Hallenback testifies, gave her the first year, from the rent, some two or three hundred dollars, and the next year " she paid me six hundred dollars for *my share* of the rent," but upon being asked how this $600 was fixed upon as *her share,* she testified, " it was not fixed at all, she simply gave it to me," and, as to the first sum, she also says, when asked how it was fixed upon as *her share,* " it was simply given to me," and during the other year that the property was rented, Mrs. Hallenback testifies that she didn't get anything.

Mrs. Hallenback also states that she used the money received from the boarders to pay for improvements on the house and for running it, but she gives few statements of payments for real estate repairs or improvements which are of substantial character, which were shown to have actually been made by her before 1894. What happened after that date is to be judged from the

events which occurred that year. So far as she shows payments made by her, it is quite apparent they were not made because of any claim by her that she owned the property. These payments were made in full view of the facts that she had the exclusive use and enjoyment of the property without paying any rent, and never in making any of them does she appear, until this suit was brought, to have claimed to either Mr. or Mrs. Rogers, or, indeed, to anyone else, that she had paid them as owner or claimant to any title in the property. There were occasional bills for repairs and the smaller improvements which Mrs. Hallenback paid, but none were accompanied by acts or statements indicating on her part a sense that she made them as joint owner or partner. She also refused, in 1893, to pay a bill for tinwork on "Marine Villa," saying she had paid enough out on the house and would have nothing to do with it. I listened to her testimony with care, to observe whether she spoke of the property as if she felt that her ownership in it was shared by anyone else. Of her furniture, or her boarding-house business, she invariably spoke with expressions indicating a feeling that they were her very own. She narrated how she took from the "Marine Villa" part of the furniture she had brought there of her own choice, asking no permission of any supposed parties, and with it furnished the cottage which she individually owns. This removal was done in the presence of Mrs. Rogers herself, who did not object, though she took exception to one or two of the things which Mrs. Hallenback selected. Mrs. Hallenback always mentioned the household goods which she put into the "Marine Villa" as "my furniture," "my bed linen," &c., "those things I considered my own," and she never spoke of them as "ours" or in any way indicating her sense that anyone else than herself had any interest in them. This equipment was just as necessary to the fitting of the boarding-house as was the structure itself, if a partnership in that business were there to be carried on, but her testimony will be searched in vain to find anything which would indicate that Mrs. Hallenback considered that she had contributed her household goods to the equipment of a partnership business

The boarding-house business itself she evidently regarded as her business· and not the business of a firm or partnership in which Mr. and Mrs. Rogers were members.  She advertised it at the beginning and continuously until the present time in her own name, " Mrs. F. Hallenback," with never a suggestion that anyone else had a share in it.  She testifies that she solely conducted and managed it.  She received all the proceeds of this business and kept them in her own name in her own bank account.  There is a statement that Mrs. Rogers received some of this money, but the latter testifies that until 1894 she had from the business nothing but such small amounts as a mother and daughter might either give to the other.

Mrs. Hallenback never furnished a statement or an account of the business from its beginning until the filing of the bill in this case, to either Mr. Rogers or Mrs. Rogers, who are asked to· be decreed to be partners with her, nor is there any testimony showing that she felt that she was so related to them that such a statement was due them.  Nor do they appear to have asked any such statement, or to have supposed they had any right to it.  They kept no account in respect to their transactions with her.  No profits were ever ascertained, none were ever divided.  After she had for many years been engaged in this boarding-house business, Mrs. Hallenback admits or is shown to have made the following purchases in her individual name :

| | |
|---|---|
| Cottage in Cape May | $1,800 |
| Lot in Cape May | 1,400 |
| | $3,200 |
| And it is testified by Mrs. Rogers, without contradiction, that Mrs. Hallenback's bank-book showed a single deposit of over | 7,000 |
| | $10,200 |

Mrs. Hallenback had no other means of gathering these moneys than her boarding-house business, carried on in the " Marine Villa," save back pension money which she received from the United States government and a small monthly pension.  The back pension money she testifies was about $3,300

14

to $3,400.  Of this she admits she used $1,300 to buy lots in Kingston, N. Y., and she claims that she used part of it to pay for the "Albert Cottage."  Mrs. Rogers states in her testimony that the pension money received by Mrs. Hallenback was $2,362.93.

Whichever account is true, it remains quite clear that Mrs. Hallenback had, during a series of years, received in her boarding-house business a very respectable sum of profits which she kept as her own individual property.  She had no consciousness that either her daughter or son-in-law, now sought to be decreed her partners, had any right to share in these profits, and I think her feeling was justified by the actual truth of their relations. They were not partners and had no right to share in these profits.

In addition to these holdings of large assets in her individual name by Mrs. Hallenback, the entire absence of any attempt to keep or furnish accounts as between partners makes it difficult to believe that she understood she was acting as a partner of Mr. and Mrs. Rogers in earning these values.

In the matter of keeping accounts there were none kept of any partnership character.  No partnership bank account was ever opened, nor were any bills rendered as due to any partnership.  From 1874 until 1891, seventeen years, the books opened were simply a cash-book and a hotel register.  This is Mrs. Hallenback's own testimony.  She further swears that as to the moneys she says she paid Mr. and Mrs. Rogers during the earlier years she has no account—"*we never took any account between us.*"

She admits that she has no means of ascertaining what moneys were expended by her between 1874 and 1892.  When it is remembered that during all this time she had the sole management of the business, how can it be believed she understood she was acting as a partner in charge when she took no steps to show to her copartners what there might or might not be in the way of profits in the business, or even to preserve the means for such a showing if it should be at any time demanded ?  Several books, which were stated to be all that Mrs. Hallenback had, were

offered in evidence by the complainant, but were instantly withdrawn by the complainant when objected to by the defendants.

It was testified by Mrs. Hallenback that the books of the "Marine Villa" had been left in the house in the spring of 1897, and that they were in the possession of Mrs. Rogers. But the latter explicitly denies that she has them or any knowledge of them except the register-book of the hotel.

As to any actual agreement or contract between the parties, Mrs. Hallenback herself first testifies that she never had any conversation with Mr. or Mrs. Rogers about what business should be carried on in the proposed boarding-house (the "Marine Villa") after it was built, then she states that her daughter and her husband knew the purpose for which the house was to be built, and that they all talked about it, but not at any special conversation. She was then asked not what she and the other parties agreed to do, or whether there was any agreement for a partnership or joint business, but "for what purpose was this house to be built?" and she replied, *"for me to continue my boarding-house there."* Not a partnership boarding-house, but "my boarding-house." Not to start a new business as a partnership, but for her to continue her old one. She subsequently testified that Mr. and Mrs. Rogers and she talked of what should be done with the money that should come in from the boarders, and that this talk was that this money should be used in the house for improvements on the house, and things that were necessary to buy, and the running of the house.

I am unable to find from Mrs. Hallenback's testimony that there was any agreement or contract between this lady and her daughter and son-in-law, touching the purchase of the lots and the erection of the "Marine Villa" boarding-house or the conduct of the business there. She originally intended to buy the lot herself; on Mr. Rogers' offer to pay for the property, if the title were put in the name of his fiancée, she assented, and the weight of the testimony shows that he paid the whole of the purchase and mortgage moneys and for all improvements, save trifling sums expended by Mrs. Hallenback. These latter she does not appear to have laid out as owner of the property, but

rather as a non-rent paying occupier, and as the mother of the owner, the testimony indicates that she was probably more than repaid by Mr. Rogers' expenditures in aid of her boarding-house business.

The testimony of Mr. and Mrs. Rogers is explicit in denial of any agreement or contract of partnership whatever. They say that Mr. Rogers bought and paid for the first and succeeding purchases, and for the house and its improvements for his fiancée and wife. Mr. Rogers testifies it was his intention when he went into it to make a home for all of them. He carried out his intention subsequently, and Mr. and Mrs. Rogers and their children and his mother used the house during the season, and without charge. Mr. Rogers denies that Mrs. Hallenback paid to him any moneys in assistance of the raising of the purchase or mortgage moneys. He states that there was no agreement of any kind in relation to the property, and that there never was any up to the year 1894, and that he never conducted a partnership business with Mrs. Hallenback.

Mrs. Rogers states that the title to the property was taken in her name as a gift from Mr. Rogers, to whom she was then engaged to be married and whom she subsequently married; that no arrangement was ever made between Mrs. Hallenback and herself or Mr. Rogers in relation to the conduct of the business and that no agreement of partnership was by her intended to be made.

The complainant insists that the testimony of Mrs. Rogers that there was no agreement was shown to be inconsistent with a previous statement made by her under oath in a suit in the supreme court of New Jersey, on February 18th, 1885. That suit does not appear to have involved the questions here mooted. In the course of an affidavit taken by her in that matter, Mrs. Rogers used these words in speaking of the "Marine Villa:"

"The house here has always been owned by me, and has been kept by my mother and me, on a joint account, as a boarding-house; the house at 2051 Walnut street, Philadelphia, was kept by my mother; I had nothing whatever to do with the house at Philadelphia, but the house here I always did have something to do with."

I am unable to find that these words indicate a partnership in the "Marine Villa" real estate property, which it is the object of this suit to have dealt with as partnership property. There is in this affidavit an explicit declaration of ownership of the house by Mrs. Rogers in her own proper person, and no suggestion that any interest was owned by anyone else. Mrs. Rogers, when she took the affidavit, evidently had the ownership of the house and also the personalty of her mother in mind, and nothing is stated which recognizes any holding of any interest in the house by Mrs. Hallenback. The utmost force that can be given the declaration is its statement of keeping of the boarding-house business in that house by Mrs. Hallenback and Mrs. Rogers on joint account.

The testimony of Mrs. Hallenback herself in this case is wholly incompatible with the view that in 1885 and before, Mrs. Rogers and Mrs. Hallenback kept the boarding-house in the "Marine Villa" on joint account. At that time Mrs. Rogers was assisting Mrs. Hallenback in keeping the house perhaps more actively than at any other period. The house had been let during the season of 1883 to Mrs. Wylie, and was run in 1884 by Mrs. Hallenback. Miss Harrison rented it in 1885, but not until July of that year. So that Mrs. Rogers, in February, 1885, was speaking as of the season of 1884, and it may be that her reference to the matter was based upon her position as her mother's assistant. The deposition in question was taken in narrative form and not by question and answer, and may not have expressed the precise words of the witness herself. Giving to it, however, the full force of an admission in the very words noted, it is entirely overborne by the weight of the evidence, as shown in the testimony of Mrs. Hallenback herself, in that of Mr. Rogers and by the whole narrative of events in this case. These all go to show that so far as ownership of the boarding-house business was concerned Mrs. Hallenback herself, individually, disassociated from both her daughter and Mr. Rogers, was the owner of the boarding-house business conducted in the "Marine Villa" from 1874 up to the spring of 1897 (except during the three years it was rented to other parties), and that during a portion of that time Mrs. Rogers was her assistant.

In the year 1894, there was a decided change in the relations of the parties touching the "Marine Villa." Previous to that time Mrs. Hallenback had, during the years that she had the house, used it and held it without either agreement or demand for any. Desultory payments had been made by her for minor improvements and repairs, but without relation to any contract or undertaking on her part to make such payments. She was, in making them, a mere volunteer. In this year, 1894, Mrs. Rogers insisted that a definite sum be paid her by way of rent. She asked Mrs. Hallenback to sign a lease as lessee of the "Marine Villa." The latter refused to sign such a lease. In the dealings touching the matter, the services of Mr. Hildreth, Mrs. Rogers' lawyer, seem to have been called in, and Mrs. Hallenback, it is admitted, paid Mrs. Rogers $3,000 by a check dated August 16th, 1894. Mrs. Rogers testifies that this payment was made pursuant to an agreement she had with Mrs. Hallenback, to the effect that Mrs. Hallenback should pay her for the "Marine Villa" $3,000 a year and also the taxes, insurance and water rent. Mrs. Hallenback states the agreement in these words:

"*Q.* Was that check not paid by you to Mrs. Rogers in pursuance of an agreement entered into between you and Mrs. Rogers that you should pay her $3,000 a year for the 'Marine Villa,' and should pay in addition thereto insurance and taxes on the 'Marine Villa?'

"*A.* No.

"*Q.* You state you did not make such an agreement?

"*A.* Didn't.

"*Q.* What agreement did you make?

"*A.* That if I made money that summer I would give her $3,000—if I made enough money that summer to do it."

It may be noticed in passing that Mrs. Hallenback's own statement of this agreement negatives the possibility that she was a partner of Mrs. Rogers or that the latter had any interest in the boarding-house business. The payment was to be made if Mrs. Hallenback made enough money, not if any partnership made it, and the occasion for the agreement was Mrs. Rogers' demand for payment to her for the use of the "Marine Villa," not for a share of profits of the boarding-house business.

Hallenback v. Rogers.

In point of fact, Mrs. Hallenback did pay the $3,000 by a check dated August 16th, 1894, which was a very early period for Mrs. Hallenback to have ascertained that she had, during that summer, made enough to pay Mrs. Rogers $3,000. This payment was the first which Mrs. Hallenback had made in response to a demand by Mrs. Rogers as owner of the "Marine Villa." Mrs. Hallenback had not dissented in any way from Mrs. Rogers or disputed the latter's right when she demised the "Marine Villa," in 1883, 1885 and 1886, and took the rents, but Mrs. Hallenback had never, before this time, herself paid anything upon demand of a return for the use of the "Marine Villa." Mrs. Rogers states that the demand was made because Mr. Rogers had invested so much money in the house and they had had no revenue from Mrs. Hallenback. It is quite natural to believe it was also stimulated to some extent by the discovery of Mrs. Rogers, in 1893, that Mrs. Hallenback had at one time made a deposit of $7,000 in her individual bank account.

There is no proof whatever to show that this payment of $3,000 was in any way profits of a partnership. It was, on Mrs. Hallenback's own showing, a payment made by her out of the profits which she had realized in her own business and on a demand made that she pay for the use of the "Marine Villa." The amount was so large that it cannot be classed with the previous occasional payments made by Mrs. Hallenback, and its relation to the demand for a rent of precisely that sum certainly goes far to support the claim that it was by way of rent. Mrs. Rogers states that the same arrangement was to have been observed in the next year also, and that in that year, 1895, Mrs. Hallenback paid her by check $500, $2,000 and a smaller amount, about $150, and also paid the taxes on the "Marine Villa," $360.50. The parties are in contradiction as to these payments, not on the point whether they were made, but as to what they were made for, Mrs. Rogers insisting that they were made for the rent or use of the "Marine Villa" and Mrs. Hallenback that she paid $500 and $2,000 on account of the purchase of the "Albert Cottage." I will discuss these variant claims in connection with the purchase of the "Albert Cottage."

The next year (1896) there appears to have been a marked falling off in Mrs. Hallenback's payments to Mrs. Rogers. The latter testifies that but $411 was paid her in 1896 for ".Marine: Villa." It appears that Mrs. Hallenback paid, on September 9th, 1896, for the insurance $296.90 at the request of Mr. Rogers. There is some dispute as to the payments made, but no claim is set up that they amounted to any such sums as were paid in 1894 and 1895. A disagreement arose at the end of this season because no revenue was received by Mrs. Rogers from the "Marine Villa," resulting in Mrs. Rogers taking possession of that property in the spring of 1897, excluding Mrs. Hallenback therefrom, and shortly afterwards this suit was brought.

The purchase of the "Albert Cottage" is another point. of variance in the testimony of Mrs. Hallenback and her daughter. Mrs. Hallenback, by her bill, claims to have purchased this property herself, and on that bases her claim that it is partnership property. She states that she assented that the title should be in Mrs. Rogers' name, and she claims that all the payments for this "Albert Cottage" have been made partly out of the business of the "Marine Villa" and partly from pension money received by her, Mrs. Hallenback.

Mrs. Rogers denies this and explains that she purchased the "Albert Cottage" herself, and that the rent which Mrs. Hallenback paid her for the use of the "Marine Villa" for 1895 was used to make the first payments on this "Albert Cottage."

In examining these contradictory statements, light is afforded by the letters of Miss Albert, with whom the negotiations were conducted. These letters were all addressed to Mrs. Rogers and evidently considered her to be the intending purchaser, and do not recognize Mrs. Hallenback as having any interest as owner. Furthermore, this transaction took place in 1895. During the previous year, in 1894, Mrs. Hallenback had been in dispute with Mrs. Rogers as to paying rent to the latter for the "Marine Villa." In the purchase of the "Albert Cottage" the deed was, with Mrs. Hallenback's knowledge and consent, made to Mrs. Rogers, and the bond and mortgage for $17,500, securing the payment of the residue of the purchase-money, was

made by Mrs. Rogers and her husband. Is it credible that Mrs. Hallenback, if she, in fact, purchased the "Albert Cottage," would, in view of her very recent dispute with Mrs. Rogers as to the "Marine Villa," have consented that Mrs. Rogers should take the title to the "Albert Cottage" while Mrs. Hallenback paid this large cash payment? And this, too, without any arrangement acknowledging or indicating that Mrs. Hallenback had any interest in the "Albert Cottage" property? On the other hand, remembering the previous disputes as to the "Marine Villa," is it probable that Mrs. Rogers would have been willing to obligate herself individually for the $17,500 of the purchase-money for the "Albert Cottage," if, in fact, Mrs. Hallenback had paid the cash payment and had an interest, unless that interest was in some way defined or limited? Would Mr. Rogers or any business man have probably consented to such a scheme, in view of the recent differences arising from Mrs. Hallenback's refusal to accept a lease for the "Marine Villa?"

It is insisted that Mrs. Rogers admits that all the money for this first payment on the "Albert Cottage" purchase came from Mrs. Hallenback. This is true, but Mrs. Rogers also explains that this money, when it came from Mrs. Hallenback, was by her paid for her use of the "Marine Villa" during the year 1895, and Mrs. Rogers further states that the payment to Miss Albert was in fact her own, having been made to the Alberts by her arrangement; that is, the money being due from Mrs. Hallenback to Mrs. Rogers was by the latter's order paid to her creditor, Miss Albert.

The deed conveying the "Albert Cottage" was, by Mrs. Hallenback's assent, made to Mrs. Rogers individually, and the latter at once assumed the absolute ownership. In 1896 she (Mrs. Rogers) rented this "Albert Cottage" and its furniture to the French ambassador, M. Paternotre, for $1,500, and took all the rent, and it does not appear that Mrs. Hallenback ever complained that this was in any way an injustice to her rights.

I think the weight of the evidence on this point is against Mrs. Hallenback's claim that she made these payments of the purchase-money of the "Albert Cottage."

In the foregoing review of the case I have considered the complainant's claim that there was in the properties named a partnership which she seeks to have dissolved and touching which she asks an accounting. If the relationship of the parties was that of partners it must certainly have been of a novel sort—a partnership *inter sese*, without any agreement between the parties, the claimant that there was such a relationship not stating that she intended to enter into it, and the other parties denying that they ever had such an intention, nor is any action touching a common business shown which indicates such an intent—a partnership with no property held by the partnership, either in title or in use, without either ascertainment or division of profits, gross or net, and without any agreement that there should be any such division, and without any agency or action of the supposed partners for each other about the partnership affairs.

I cannot reconcile such a showing with established principles in this branch of the law of contracts. In *Wild* v. *Davenport, 19 Vr. 131*, Mr. Justice Depue, speaking for the court of errors, thus states the law : "*Inter sese*, the fact of partnership, as well as the rights, duties and obligations of partners, arise wholly from the terms of the contract." In the case in hand there is no agreement or contract shown even by the testimony of the complainant herself. *Robbins* v. *McKnight, 1 Halst. Ch. 645,* came up on appeal from this court, and the question of the existence of a partnership *inter sese* in the property in dispute was raised. Chief-Justice Green, delivering the judgment of that court, declared that " to constitute a partnership as between the parties themselves there must be a joint ownership of partnership funds." The joint ownership of property is thus made an essential requisite of the relation of partnership when asserted *inter sese.* Where the question presented turns upon the ownership of property by the partners, it is difficult to conceive how there could be a partnership when it appears that the property is owned in severalty and that the supposed partnership has no interest either by way of title or use which is common to all its supposed members.

I am unable to find any agreement in the case under considera-

tion, whereby there was any property in which the complainant and defendants have any common interest. The title to the properties in question is admittedly severally in Mrs. Rogers, and, in my view, the use of the "Marine Villa" by Mrs. Hallenback, and of the "Albert Cottage" after its purchase, was in no sense jointly with Mr. and Mrs. Rogers for a common purpose, but distinctly severally for herself in conducting her own individual business. All the testimony indicates that nothing could have surprised Mrs. Hallenback more than would the appearance of Mr. and Mrs. Rogers at her desk asking to see her books of the business, her bank account and check-books, or exercising any other privilege, such as is an every-day occurrence between partners.

The essential test of the existence of a partnership is stated in the judgment of Lord Cranworth in *Cox* v. *Hickman, 8 H. L. Cas. 268.* His lordship declared that the real ground of liability is that the trade or business has been carried on by persons who acted in behalf of the person sought to be charged, with his knowledge or permission. When parties so associate themselves or so hold themselves out to others, they are liable to the trade obligations and are entitled to share in its profits. The principle stated in *Cox* v. *Hickman* has been accepted in our courts (*Wild* v. *Davenport, ubi supra*), and is of value in ascertaining the *status* of the parties in the case under consideration, for it established the rule that a person not actually engaged in the business as a partner and not holding himself out as such cannot be held even by creditors to be a partner because of sharing in the profits, unless by virtue of some contract expressed or implied creating that relationship. *Seabury* v. *Bolles, 22 Vr. 107.* In the present case there was no showing, nor indeed was any claim made even in argument, that there was any express agreement between the parties to enter into the relation of partnership, nor any sharing of profits, nor did any of the supposed partners ever act for the others touching any partnership or common business.

It is insisted that the payments by Mrs. Hallenback for the improvements, repair or purchase of the property standing in

the name of her daughter, Mrs. Rogers, and the various acts of benefit by Mrs. Hallenback done and accepted by Mr. and Mrs. Rogers concerning that property, necessarily imply a contractual relation of partnership between those parties. When it is suggested that the contributions of value by the several parties have no relation to any proportional interest which the parties held in the premises, the complainant contends that this need not occasion embarrassment, as it may be readily adjusted by the application of the rule that " equality is equity," and each of the parties may be held to have a third interest in the " Marine Villa " and the "Albert Cottage," the titles to which stand in the name of Mrs. Rogers.

I do not think the evidence of the various acts of the parties in interest justifies such a judgment. This would be to impose upon the parties a position not intended or contemplated by them, which, if it existed, must have arisen because of their express agreement or because their acts and representations to each other touching the premises necessarily lead to the conclusion that they had so agreed. In *Wilson* v. *Cobb, 1 Stew. Eq. 177*, Vice-Chancellor Van Fleet declared that " there is no such thing as a partnership by implication or operation of law. The relation *inter sese* is founded in voluntary contract and cannot exist independent of it. As to third persons, the relation may exist in spite of an agreement that it shall not." The decree in this case was reversed because the court of errors took a different view of the facts, but the vice-chancellor's statement as to the law of partnership *inter sese* was not criticised. See *2 Stew. Eq. 361*.

But if it be assumed that Mrs. Hallenback did, in fact, pay part of the purchase-money of the " Marine Villa " and of the "Albert Cottage," as there is no proof that these payments were made under any agreement therefor between the parties, what effect would such payments have in view of the kinship of the parties? On this assumption Mrs. Hallenback paid her money and consented that the titles should be conveyed to Mrs. Rogers. They were mother and daughter, the latter being the only child of the former. Whatever money Mrs. Hallenback expended on

these properties was so spent with full knowledge that her daughter, holding the title, was receiving the full benefit of the payments.

Between strangers, if a conveyance of the legal estate be made to one and the payment of the purchase-money by another, a presumption arises that the party receiving the legal estate holds it in trust for the person who pays the purchase-money, unless this presumption be overcome by proof that it was the intention of the party advancing the purchase-money that the grantee in the conveyance should take beneficially. Our courts have frequently enforced this rule, but it is just as well settled that where the parties hold to each other the relation of parent and child or husband and wife, a contrary rule prevails. Where a parent pays the consideration and has the conveyance made to the child, no such presumption arises from the payment of the consideration. "In such cases," the court of errors has declared, "the presumption is that an advancement or settlement was intended, and a resulting trust will not arise unless the presumption that the transaction was intended to be a gift be overcome by proof." *Read* v. *Huff, 13 Stew. Eq. 234; Peer* v. *Peer, 3 Stock. 432.*

In the case under consideration, far from overcoming this presumption, there is no evidence which antagonizes it. The sum of the proofs on the point is consistent with the legal presumption that Mrs. Hallenback in expending her moneys, knowing the titles were held in the name of her daughter, had neither belief that there was, nor intent that there should be, any contractual relation between them as to these payments. They were gifts.

I will advise a decree dismissing the complainant's bill, with costs.

An order to show cause why a receiver should not be appointed and an injunction issue according to the prayer of the bill, is pending and unheard. The disposal of the case upon the final hearing makes it unnecessary to consider the questions raised by this order, and I will advise its dismissal.